Who is submitting this? This is from the Appalachians. Right. Okay, let's go. May it please the court. William Pratt demand for appellants. In 1993 this honorable court held the constitutional right to minimally adequate medical care was not a novel proposition. It's in Colley v. Brazos County, 981 F2D 237. Despite this clearly established jurisprudence, at least two nurses have explained that Ms. Lilly was not transferred to a hospital which was capable of providing her with life-saving medical care based on a policy of practice inside the jail which prevented them from doing so. This ensured her death. What was the policy that you're talking about and what's the evidence that it exists? Nurse Roberts said that there was a policy that prevented them from transferring Ms. Lilly to the hospital at ROA 996. Nurse Smith said there was a procedure at ROA 1015. What was, okay, that's great. So 1015 is the second one? 996 and 1015. So what is the policy? The policy, the de facto policy is to not transfer inmates to the hospital without Dr. Wells' approval. That's correct. So how does that show that they didn't provide proper medical care when they are required to get a doctor's approval to transfer a patient to the hospital? Now, Dr. Wells may have been at fault, but Dr. Wells isn't in this action. So how is it the nurse's fault? He is in the action, Your Honor. Well, he's not. He's been removed under the statute of limitations. So, you know, that's another point you're going to argue today. But how is it the nurse's at fault for following a doctor's directive? Even if we ignore temporarily the nurses and whether or not the nurses are at fault, Your Honor, there still was a procedure and policy in place promulgated by the county's final policymaker which prevented them from transferring to the hospital. So even if we eliminate the – You're talking about municipal liability now. You're not talking about the nurses. That's where I started, Your Honor. Municipal liability. Okay, well, who's the policymaker? Well, clearly, Your Honor, appellants believe that it is Dr. Wells as the final decisionmaker with respect to medical care. Doesn't state law determine who the policymaker is for a municipality? Yes, Your Honor. What does state law provide here? As a general rule, it says the final policymaker for counties and law enforcement is going to be the sheriff. However, this honorable court has found that within a certain area of – designated area of municipal responsibility that another individual can be the final policymaker with respect to that designated area of administration, such as in Czar and Alvey City, Wichita. I thought there was a distinction between a policymaker and a decisionmaker for municipal liability purposes. I agree, Your Honor. There is, in fact, a distinction. However, that final decisionmaker can be the final policymaker where none of their views, none of their decisions are being overseen. Here we know that Dr. Wells was – no one oversaw his creation of policies, practice, customs, or protocols. We know that he didn't report to anybody concerning his creation of those protocols. We know that he didn't speak to the sheriff about those protocols. And we know that he didn't have to report to anybody about his decisions to treat or not treat inmates. Therefore, the authority concerning medical decisions was given by the county directly to the doctor, and that was the county's decision to do as per the contract which was signed with the doctor. The sheriff was not a party to that contract. It was between the county judge and Dr. Wells, thereby showing that the county intended to make Dr. Wells the final decisionmaker without any review whatsoever with respect to medical care at the jail. This is further evidenced, Your Honor, by the disclosures in this case which show that the – yes, Your Honor. The policy was what exactly? The de facto policy, Your Honor, is different from the written policy as this honorable court has found on several occasions. So in this case, the de facto policy, as evidenced by Nurse Roberts and Nurse Smith, was to refrain from transferring inmates to the jail without Dr. Wells' approval. Facially, there's nothing wrong with that policy. Facially, there is nothing wrong with that policy. That is correct, Your Honor. Presumably, they need to have somebody who has the ability to make that determination, make that determination, and they designated that Dr. Wells was the person to make that determination even when he was not at the jail. Well, as I understand it, he received the data through some electronic basis. He was looking at the EKGs or whatever it was. He received a copy of the EKG sometime after it was taken via cell phone photograph. That is correct, Your Honor. Right. So it was sent to him, and he looked at – and again, I don't know what's in the record in this respect. But he looked at it, and he said, you know, do not transfer to the hospital. He actually didn't say that, Your Honor. He said, let me know what happens next. All right. Well, the record is clearly developed in this case, Your Honor. The deposition has been taken. The Texas Rangers did a full investigation. This is not a motion to dismiss. This is a summary judgment. So the record is clear. I'm well aware that it's a summary judgment, counsel. And I'm saying they sent him the EKG, and he made the decision, actively, passively, or whatever, that they want to transfer your client to the hospital. That is correct, Your Honor. Right. And that was the defective policy, Your Honor, of not transferring her to the hospital because Dr. Wells is not present. There must be a distinction, I would think, between a policy and a decision that is made in a particular case. Right? What you're describing here is information was communicated to the doctor. The doctor made a decision with respect to whether to transfer the hospital. How does that equate to a policy for municipal liability purposes? Well, Your Honor, the courts have found that a decision that was made in an isolated instance that was not designed to control later instances can be indicative of a policymaking. Okay. But where is McLennan County on notice that its policy is problematic? Well, again, the de facto policy, Your Honor, or the written policy? Either one. In this case, Your Honor, the de facto, the problem of them not being aware of the de facto policy is indicative of the underlying problem. That is that the policymaker, whoever this court decides it is with respect to medical care at the jail, was not aware of this de facto policy, which thereby caused the death and misliving despite the uniformity. If McLennan County hired a competent physician to assess whether inmates should be transferred to the hospital, why is the county on notice that that's a negligent or bad unconstitutional policy? First and foremost, Your Honor, I would argue that this doctor was not competent in this respect because he could not read an EKG and was not aware that there were no artifacts in the EKG as per Dr. DeLauvel's uncontested expert testimony. And how does McLennan County know that? Well, it's its job to know that, Your Honor, as the entity that is responsible for detaining people. What evidence is there that they were on notice prior to this incident that Dr. Wells was incompetent? Your Honor, first, I'm not aware of any. However, that is not the test in this court. My understanding of the test in this court that it has been is not whether or not there's a policy outcome, whether or not there have been previous instances of death as a result of the policy. The question is whether or not there's been a policy implementation at all. And here there was, in fact, the policy implementation. So whether or not there's been a previous instance is irrelevant to the conditions of confinement claim against McLennan County as per discourse jurisprudence. What is the policy of limitation? The policy of limitation, Your Honor? Yes, I thought you just used the term policy of limitation.  Not intentionally, Your Honor. I referred to the conditions of confinement. I'm not aware of the policy of limitation. Well, I must have, I just didn't hear you correctly. I might have misspoke, Your Honor. We're still talking about municipal liability. That's why we keep talking about policies. That is correct, Your Honor. So then there is also liability, individual liability with respect to the nurses. Are you going to talk about that? Not in detail, Your Honor, given what I know of this honorable court's jurisprudence concerning 1983 deliberate indifference to qualified immunity. So I really don't believe, because I believe that the plaintiffs can win, the appellants can win in this case even without the individuals, even if the individuals have qualified immunity. Are you conceding that the district court was correct in finding qualified immunity? Not at all, Your Honor. And I believe that that issue is adequately briefed. And I believe that the individuals here were, in fact, deliberately indifference as evidenced by the fact that both Nurse Roberts believed that she was having a cardiac event, by the fact that Dr. Wells believed she was having a cardiac event, and that both individuals believed she needed to be transferred to the hospital. So given that, I believe that there is deliberate indifference and they're not entitled to qualified immunity. You just said Dr. Wells believed she should be transferred to the hospital. That is correct, Your Honor. I thought he didn't give the order for her to be transferred to the hospital. That is correct, Your Honor. He did not. However, he did acknowledge that she should have been transferred to the hospital as quickly as possible, given her EKG. Where is that in the record? 843, Your Honor, ROA 843. And Dr. Lobel concurs at ROA 902. Under the circumstances, either the nurses knew that Ms. Lilly was exposed to a serious risk of substantial harm, or, as the county indicates, they did not know at all. If they did not know at all, this evidence is a failure to train, regardless of who the policymaker is, which establishes Monell liability as a matter of law. I'm sorry, failure to train the nurses? That's correct, Your Honor, because at page 34 of their response, the county acknowledged that the nurses did not know of any substantial risk of serious harm to Ms. Lilly. If we accept that as true and as a judicial admission that they did not know, then we know that they didn't know how to read an EKG, we know they didn't know that the EKG passed as self-diagnostic, we know they didn't know to transfer her to the hospital, and we know they didn't know whether or not they had the authority to transfer her to the hospital. Did the district court address a claim of failure to train liability under Monell in this case? I'm just not remembering right now. Your Honor, I believe that the court fundamentally misunderstood a variety of components as evidenced by, one, its conclusion. The short answer is I don't know, Your Honor. Okay, so I can read the order. I just don't recall the district court addressing that. You're saying you pled it and briefed it? You pressed that claim, the failure to train claim? I believe so, Your Honor. I will double-check that. I'll find that in the record of the complaint looking for the failure to train. I'll get that done. I'll address it on the reply. But I do believe that the failure to train was absolutely pled and addressed. Returning to Dr. Wells and the statute of limitations, you're urging equitable estoppel here. Of course, that was not pressed in district court. This was raised for the first time on appeal, my understanding. I'll double-check that as well, Your Honor. Wait a minute. You don't know whether equitable estoppel was raised in district court? Your Honor, I know that we addressed several arguments concerning the statute of limitations at the district court, I believe, and I would suggest that that was addressed, but I will double-check that before I get back up on reply. But I believe it was addressed. Because the whole argument here was that the plaintiffs asked the county, via public information request, who was involved in her care. And the argument all along has been that the plaintiffs identified as quickly as possible that this individual, once the plaintiffs identified that he was, in fact, involved, they sued him. This request was made, I understand this action wasn't filed until two days before the statute of limitations ran, the two-year limitations. So when was this request made? The request was made, I believe, in March of that year. That doesn't help me. March of that year. When within the space of two years was the request made? Like six months in, one year in, 15 months in? I know in your brief you talk about how this case was transferred to another lawyer and the lawyer wasn't capable, so it came back to someone, I believe. Yes, Your Honor. The original public information request was made to McLennan County in early summer of 2016 and was responded to on July 15, 2016. That still doesn't help me. How many months between the death and the end of the two years? October 2016. Approximately 20 months, Your Honor. So with four months left on the statute of limitations, the request was made finally to who's involved in this? Yes, Your Honor. All right. Monell liability is also available in this case because Dr. Wells made decisions as evidenced by the county's response at page 21 and 22 as the final decision maker in this case, thereby making this case on all fours with both Zarnoff v. City of Wichita and, of course, the latest case, Webb v. Town of St. Joseph, 925F3D209. In Webb, the individual made a decision that was a deliberate choice between two alternatives with respect to the subject matter issue. Here we have a similar issue in that the doctor made a decision between two alternatives, that it was either to send her or not send her to the hospital for care. We also have ratification if the sheriff is found to be the final policymaker because his affidavit demonstrates that even now, even after her death, even after the reprimand from the Texas Medical Board, that they did not find, he did not ever know of anybody to not be providing medical care. In this case, the county disclosures never identified the sheriff as the policymaker. At ROA 735, they identify him as someone with knowledge of policies at the jail, not even medical policies at the jail. And in this case, we also know that Wells was fully responsible for everything that happened at the jail, had full reign and control. With conditions of confinement, we know that there was a policy procedure that prevented the access to the hospital. We know that Dr. Wells delegated his authority, both in this case and in other cases, to his nurses to evaluate and diagnose inmates, as evidenced by the Texas Medical Board's reprimand. And we also know that pill pass was by design unstaffed during the – we know that the medical unit was unstaffed during pill pass, making this case comparable to Smith v. Moore, in which case the court found that the – excuse me, not Smith v. Moore, in which case the court found that the inability to have anybody on site who was authorized to transfer somebody to the hospital was, in fact, a constitutional violation. Again, that was Colley v. Brazos County, 981 FTV 237. We're going to take some time for rebuttal here. Thank you, Your Honor. May it please the court. Tom Brant for McLennan County and Nurse Kimberly Reinfleisch. In plaintiff's counsel's presentation a moment ago, he said that McLennan County was not aware of the de facto policy. That's an admission that is crucial and fatal to his claim because if he's saying there was a de facto policy, it had to have been known to McLennan County so that it could have ratified this de facto policy. What we know is that the actual policy of McLennan County was to provide constitutionally adequate care to its prisoners. That's what the health services plan said, and that's what the contract with the doctor provided for. But another way to look at this case is not only from the policy down, but from the facts up to see there cannot be liability against the county or actually any of the individuals because of the care that was given. If you look at the time period, it's 10 hours that Ms. Lilly was in our custody. From 1130 a.m. when the district court said you didn't pass the drug test, you need to go to jail, 1130 a.m. until 930 when, without any permission from a doctor, we called 911 and had Ms. Lilly transported to a hospital where she had died at that point. There was no policy that prevented anyone from accessing the hospital. That was proof in this case as to what was actually going on. But if you look at that 10-hour time frame, you can break it up kind of conveniently into three sectors, the first six hours, the next two and a half hours, and then finally the last hour and a half. Roughly the first six hours, 1130 to about 520, that period of time was when Ms. Lilly was taken into the intake. She was seen three separate times by Nurse Outley, who was previously in the case but has been dismissed. Nurse Outley looked at her at 1130, the original intake, and Ms. Lilly was crying but not complaining of anything. She was crying, upset that she had been placed in jail, but she wasn't expressing any pain or any symptoms at that point. And I don't want you to forget that because this is a helpful chronology, but what, if any, data is shown in the jail records, et cetera, of the fact that I believe she was tased three times at the court? Yes, that came out in this chronology, it came out in the second visit to Nurse Outley. Go back to where you were then. 1130 is the first intake examination by Nurse Outley. She examines her, so she has medical examination at that point. 330, Ms. Lilly is brought back to the medical intake and is examined a second time by Nurse Outley, and this time she's complaining about back and leg pain. And then she tells Nurse Outley, I was tased at court, and she was. It was part of her, when the criminal district court said, you're going to go to jail now, she got upset and she was tased at that point. But she's telling now the nurse, I was tased, and of course that may account for the back and the leg pain. Then she's examined by Nurse Outley. Nothing happens until now, 520. 520, which is roughly six hours into our 10-hour chronology, that's the first time Ms. Lilly expresses any discomfort in her chest. She says she has some arm pain, which she attributes to the fact that the jailers had lifted her up. But she also says chest pains, and she says leg pain as well. So then at 520 she's taken to the medical ward. At 6 p.m. is when the first EKG is given to her. That is the first EKG, and as you see in the plaintiff's brief, the reading says consider acute STEMI ST elevation and consider acute infarct. Those are the readings that are on the machine. So 6 o'clock, that's when that first EKG is given. Now we're past the first six hours. Now we're going into the next phase, which is the two and a half hours. So you have the first EKG, and it's giving you some indication that something here could be wrong. So that nurse then gave that information to the director of nursing. We have LVN nurses and we have the director of nursing who's an RN. That's Nurse Roberts. So she looks at that, and from her understanding, Ms. Lilly is not exhibiting any other indications. She's ambulatory, walking around. She's talking, communicative, not sweating profusely. But she has this reading, and she's been agitated. So Nurse Roberts thinks, I don't think this is an accurate reading. I want you to, and she instructs, I want you to, at the next shift, so it's 6.30 now, the next shift begins at 7. She says, okay, the next shift I want you to go and take another reading. Enter now Nurse Reinfleisch. She comes in at 6.45, early for her 7 o'clock shift. She says, okay, she's going to do the pill pass, give the pills to all the inmates, and then she has it on her to-do list to go and take care of Ms. Lilly and do another EKG and check to see if it's right. So she does that. So she checks it, and she checks it twice. She's not trying to read it, but she does check it twice, and she gives it over to, she reports it to Nurse Roberts as to what is going on here. And the readings are consistent. So then she communicates that to Nurse Reinfleisch. Now, then we get to 8 o'clock. So we had these first three EKGs, and on the last EKG there is instructions given. Nurse Roberts says, okay, what I want you to do is I want you to give her an aspirin, 325 milligrams of aspirin. I want you to give her nitroglycerin, and I want her to calm down, and you take her blood pressure after that. So that's what she does. And she also says, and I want you to give the information to Lieutenant Ward, which she does. Nurse Reinfleisch does all of that. And she checks significantly. She checks the blood pressure after the aspirin and the nitroglycerin, and it's normal. So at that point, she's stabilized. It's about 8 o'clock. So now we're entering the phase between 530, 520, and 8 o'clock was the phase of evaluation and treatment. The treatment was given, aspirin, the nitroglycerin, taking the blood pressure again, seeing that she's stable, looked okay. At that point, then, we start the last hour and a half. During that last hour and a half, there's communications going on between Nurse Roberts, who is off-duty and off-premises, but in communication contact, also the doctor, who's off-duty but is in communication. So there's communications between Reinfleisch and Roberts and Wells, the doctor, the director of nursing, and the nurse who's on the scene. And they have communications about what's going on. Dr. Wells says, okay, I want you to check on her. I want to communicate to the nurses that I want you to check on her. She could possibly be having a heart attack, so I want you to check on her. And they say, okay, we'll do that. In the meantime, what interrupts that is a jailer saying, she's nonresponsive, we rush to go get her, and we start treating her immediately. 911 is called, paramedics arrive, and they try to resuscitate her. But all along the way, everyone is trying to take care of Ms. Lilly. You can question their judgment. You can say you could have, should have, would have. But what you can't question is the fact that these individuals were all trying to do the best they could in a difficult situation, and they were responding. They weren't doing the classic test for deliberate indifference. It's simply not met under these facts. And the district court did a very thorough job of analyzing those facts and saying, yes, these people were not deliberately indifferent. And all you've got on the other side is some allegation that these individuals didn't meet the proper standard of care for a medical standard of care. And without conceding that, I'm just saying it is irrelevant. That's not the question. Under the 14th Amendment, the standard would be deliberate indifference. Under the case O'Hare v. Corinth, the city of Corinth case, that this court has decided. So there was more than just a minimum of effort to take care of Ms. Lilly. Her tragic demise was not caused by any policy of the county, nor was it caused by deliberate indifference by any of the individuals present. They were communicating about her. There was a constant flow of communication. Could it have been better? Of course. But that's not the standard. They were making an effort all throughout to assess and address what was happening. And I notice that my time is just about out, so I will just say with regard to the county, there is no policy other than the policy to provide the constitutionally required level of care. And what you see here is an effort to do that. This is not a situation where there is a – this is an episodic acts or omission case. It's not a conditions of confinement case. And as an episodic acts or omission case, it is one that we look at and we say, was anyone deliberately indifferent? Because if anyone was deliberately indifferent, then that's a constitutional violation. There is no one here who was deliberately indifferent. Secondly, and only secondly would you go to the next step, which would be, okay, if you were to find that some individual exhibited deliberate indifference, then you would have to say, was that deliberate indifference caused – was that caused by a policy customer practice of McLennan County? Absolutely not. The county provided a doctor and presumed to be a doctor who's competent. There was no notice to us of any problems that we could say, oh, we were on notice. The state of Texas licenses these doctors, these nurses. The sheriff is not a medical person. The county commissioner's court not comprised of medical individuals. They're entitled to rely on this. There was no policy customer practice of deliberate indifference in here. And with that, Your Honor, I'll yield the rest of my time to my colleagues. Thank you. Good afternoon. Greg Hudson here on behalf of Nurse Desiree Roberts. I've got a very short amount of time here to discuss Ms. Roberts' actions. I thought to get ahead of the game I would prepare a synopsis of each of her actions, which began at 6.30 p.m. as established in the record. This is an appeal of summary judgment, and so on the left side of my chart you see statements taken from my client's summary judgment motion. And then you can, on the right side, see that they sync up with those. Did Roberts have the authority to call somebody and say, this woman needs to go to the hospital? She believed that if there was a doctor there and available, that the doctor needed to make that call. She said that to the Texas Rangers, and she did express that in her summary judgment affidavit, if the doctor were available. She was not deposed in the case, so we don't have her testimony of what would happen if it was a clear emergency in her mind. Because in her mind, by your chart, she thought that Ms. Lilly was having a cardiac event. After the second EKG. Yes. And she sprung to action. She thought Dr. Wells was going to send Ms. Lilly to the hospital. That is correct. Another almost an hour passes and nothing's happening. There was a technical issue of getting the EKGs in hand, well, I say in hand, electronically on her cell phone so she could forward them to Dr. Wells. But I think it's very clear between 8.04 and, well, actually until 8.39 to 9.26. Right. Nothing happened. Well, she was consulting with Dr. Wells on the EKGs. He just didn't have them in hand in order to follow up. One of the issues was neither one of them were at the jail. This was after their shift. They were working from home. You know, it's clear that Nurse Roberts didn't just abandon Ms. Lilly's treatment after she left work for the day. She stayed on the phone. She gave instructions to the nurses. She told them, you know, please administer aspirin. Please administer nitroglycerin. Move this inmate to the medical wing. Check on her within five minutes of your administration of the medicines to make sure her blood pressure was okay. Check on her every 15 minutes. Send me the EKGs when you get them. I'll forward them on to Dr. Wells. I think this is in her summary judgment affidavit. This was the first heart attack that occurred on her watch at the McLennan County Jail. So it wasn't like there was this whole prior history. Secondly, she never assessed Ms. Lilly face-to-face. She was never told that Ms. Lilly had any sweats or other factors that would be indicative of a heart attack. You know, clearly... But she had herself concluded that she was probably experiencing a cardiac event. I mean, that's... As when she did reach out to Dr. Wells, she had made that conclusion. This is very likely a cardiac event. I think she followed the chain of command and sent the EKGs to Dr. Wells. There's some question in the record, and, again, she wasn't deposed as to her ability to read an EKG. I know that I think that there was no... She did not receive any formal training, or the record doesn't reflect that she had a formal training in reading EKGs. In short, I think if the court were to review this continuum that I've laid out in this chart, you'll see that Nurse Roberts was engaged. She was at home. She was doing the best she could to coordinate the individuals. Your time has expired. Thank you. May it please the Court, my name is David Wright. I represent John Wells. This court should affirm the dismissal of Dr. Wells because... Was equitable estoppel urged in district court? No, sir, I don't believe it was. Well, don't tell me what you believe. Was it or wasn't it? No, it was not urged in district court. It was urged for the first time on appeal. All right. I'd add to that, Judge Barksdale, because equitable estoppel as applied in Texas is very limited basically to cases of misnomer or misidentification of a corporate entity. It's important to understand that the Texas cases are relevant because Texas statute of limitations applies to 1983 actions, including any kind of extensions of the statute of limitations, including equitable estoppel. Right. And so that's why it's important in my brief sites, both Texas and federal cases, because both are relevant to this, but they're also very consistent, too. They're consistent with respect to when the statute of limitation accrues, which is when the injury occurs, a person should have known of the injury, and it's consistent with respect to that the statute of limitations is not extended because a party does not know the identity of potential parties to the case. The statute of limitation actually affords the opportunity for a party to discover that kind of information in order to be able to sue on time. Do you know why his identity was not revealed in repeated discovery requests? I do not know. All I do know is it was not Dr. Wells that had anything to do with that. I get that. Yes. No, I'm not sure. I'm not sure why that was until the Texas. This wasn't in a discovery request, was it? They just requested the information. I mean, the action hadn't even been filed. It was ultimately found, I think, in the Texas Rangers report, which is something that was done. Right, but the first request, which we hashed out during an appellant's argument, the request was not made for this information about him until after 20 months. The action wasn't filed until after 24 months less two days. Correct. So it wasn't a discovery request, was it? No, it was not a discovery request. I think it was an open records request, which ultimately the information was obtained. But in any case, I believe that the real issue is there's a two-year period. I mean, counsel did explain some reason for some delay during that two-year period, but nevertheless the statute of limitation imposes an obligation on a party to use that period of time in order to get the information they need to be able to file their lawsuit. The one thing I want to address is a case that seems to be the basis on which plaintiff relies, and that's the United States v. Kubrick case. That case, I think, frankly favors my argument in this case and does not suggest that the statute of limitation should be extended because the name of the defendant has not been recovered. It has nothing to do with that. And, in fact, the language plucked by the plaintiff out of that case as to critical facts does not suggest in any sense that the Supreme Court of the United States is saying or changing any law with respect to the plaintiff having an obligation to investigate their case and given the period of the statute of limitations to do that, including identifying potential parties to the case. I believe that's my time. Thank you, unless there are any questions. Thank you. Your Honor, I'd like to correct a previous misrepresentation. I checked the record. Equitable tolling was not mentioned at the district court level. Counsel was correct. Also, in my initial time, in the last part of the initial argument, I cited again DeCauley for the proposition that staffing conditions at the jail were found by this honorable court to be an unconstitutional condition of confinement. That was also an incorrect citation. That site was intended to be Scott v. Moore, 85, F3D, 230. Counsel for the county represented that everyone in this case was trying to help Ms. Lilly. However, Dr. Wells said that even Nurse Roberts' conduct in this case was unreasonable. That is an ROA 1070. Also, concerning the absence of another death in the case, this court has found in Montana v. Orange County, 842 F3rd 856, that that is not necessary in order to find it because the court is looking for policy implementation, not policy outcome. In this case, there were signs of a heart attack. There again you used policy of limitation. Am I hearing it correctly? We have trouble with my hearing correctly. You said policy of limitation. I'll try to play back what I said, Your Honor. I was talking about an absence of another death in the jail. Right. Implementation, Your Honor. Implementation. Thank you. Yes. Thank you. Policy implementation versus policy outcome is what this honorable court has found its test is. In this case, we have signs of a heart attack plus three EKGs from a machine that was designed to reveal EKGs, and all Ms. Lilly received was a nitroglycerin tablet and an aspirin. The magnitude of the district court's error is exemplified by its finding that Nurse Roberts provided Ms. Lilly with adequate medical care despite the fact that even Dr. Wells finds that her conduct was unreasonable. If a criminal defendant were to exhibit signs of a heart attack in this courtroom, in this courthouse, there is no question whatsoever that this honorable court staff would spring into action rather than wait three hours. Ms. Lilly was entitled to absolutely no less under the circumstances. With that, I yield the remainder of my time. Thank you, counsel. Thank you, Your Honor. The court will take a brief recess.